**SAUL EWING** LLP

Thinking ahead.
So you can move ahead.℠

February 2004

# Insurance Update

## New Anti-Spam Law May Impact Insurance Marketing Efforts

In another example of the creeping tide of Federal regulation of insurance, the recent CAN-SPAM[1] law signed by President Bush on December 16, 2003, includes provisions regulating insurance e-mail marketing and communications.  The law, which became effective on January 1, 2004, preempts any existing state anti-spam laws and primarily regulates "commercial e-mail."  The law should not impact insurance company advertising as many of the restricted activities are generally prohibited by existing state insurance laws.  However, certain provisions of the CAN-SPAM Act, including the creation of a national "Do-Not Spam List" could prove problematic for insurance marketing efforts in the long-term.

**Overview of the Act**

"Spam" is the popular term used to describe the very unpopular torrent of unwanted junk e-mail that invades business and personal e-mail inboxes each day.  According to published Internet statistics, more than 31 billion e-mails are sent <u>each day</u>.  Of that number, more than half (about 58% or about 18 billion e-mails) are considered spam.  Companies incur literally billions of dollars each year ($8.9 billion for 2002) in expenses and lost time as a result of spam.  In response to mounting  public outcry, Congress took action in 2003 to attempt to limit and punish purveyors of spam.

The CAN-SPAM Act principally regulates "commercial e-mail." The Act defines "commercial e-mail" as "any electronic mail message the primary purpose of which is the commercial advertisement or promotion of a commercial product or service."  Specifically carved out of the definition of "commercial e-mail" are "transactional or relationship messages" ("TRMs").  TRMs are subject to different standards and are not regulated as "commercial e-mail."  TRMs are defined as e-mails the principal purpose of which is:

- To facilitate or complete a commercial transaction that the recipient has previously agreed to enter into with the sender (for example, e-mails in response to an insurance application);
- To provide recall or warranty information about a product or service used or purchased by the recipient;
- To provide notice of changes or periodic statements regarding a subscription, membership, account or similar ongoing commercial relationship;
- To provide information directly related to an employment relationship or related benefit plan; and,
- To deliver goods or services, including product updates or upgrades, to which the recipient is entitled to under the terms of a transaction.

The CAN-SPAM Act is designed primarily to deter and punish professional spammers and hackers.  For example, the Act makes it a crime to hack into an innocent party's computer and send spam from it.

---

[1] "Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003" ("CAN-SPAM Act" or the "Act").

The Act also makes it illegal to falsify header information (*i.e.*, who the e-mail is coming from) for both commercial e-mail and TRMs, as well as the registry of five or more electronic e-mail addresses with false information if multiple e-mails are sent from accounts. The Act imposes criminal penalties including prison terms of up to five years for violations of these provisions and fines of up to $6 million.

Other provisions of the CAN-SPAM Act, while aimed at professional spammers, will nonetheless affect the way many legitimate businesses, including insurers, conduct themselves through e-mail. The Act imposes a number of requirements that all businesses should be aware:

- **Functioning Return Address**: Every commercial e-mail must include a conspicuous functioning (and legitimate) return e-mail address.

- **Opt-Out Mechanism**: Recipients must be given the ability of opting out of receiving future e-mails by responding to the return e-mail address provided in a commercial e-mail. Alternatively, the sender may provide an Internet or other menu-based system that permits a recipient to choose which e-mails he or she wishes to receive, as long as one of the choices is to receive no e-mails at all. The sender, and those acting for the sender, must stop sending e-mails within 10 business days of the receipt of an "opt-out" request.

- **Notices**: Commercial e-mail must include the following: (i) clear and conspicuous identification that the e-mail is an advertisement; (ii) clear and conspicuous notice of the ability to opt-out of receiving future e-mails; and (iii) a valid postal address.

The Act further regulates companies whose products or services are promoted in improper e-mails, even when the company itself is not the sender of the e-mails. This provision may prove troubling for insurance companies who could be held responsible for the e-mail activities of their agents. It is unclear at this point how this provision will be applied to producers, and may ultimately depend on whether the producer force was captive or independent. Insurance companies should nonetheless consider educating their producers about the Act and specifying compliance with the Act in their producer contracts.

**Do Not Spam List**

Perhaps one of the more challenging aspects of the Act are the provisions requiring the FTC to report to Congress on the creation of a national "Do-Not-E-Mail" registry (similar to the FTC's "Do Not Call" list) which the FTC may establish no earlier than September of 2004. Such a registry may hamper the efforts of a number of insurers that are currently utilizing e-mail for purposes of "cold calling" and initial marketing campaigns. Given the American public's frustration with spam, it is likely that the FTC will vigorously pursue the implementation of the "Do Not Spam" registry. As a result, many insurers may have to revert to traditional event sponsorship and advertising in order to drive requests for more information.

**Enforcement**

Generally, the FTC will enforce the Act. The Act does allow for states and Internet Service Providers ("ISPs") to bring civil suit against Spammers for violations of the Act. However, "for any person

engaged in providing insurance," the Act gives enforcement authority to the "applicable State insurance authority." If the State insurance authority elects not to exercise the power, then the FTC is given sole authority.

It remains to be seen whether state insurance departments will elect to take the primary role in enforcing the Act given such department's traditionally scarce personnel and IT resources. Nevertheless, it seems doubtful that state insurance regulators would voluntarily cede any authority to a Federal agency, especially given the National Association of Insurance Commissioner's strong desire to maintain exclusive state regulation of insurance. Additionally, in the vast majority of states, the Act represents a natural extension of existing insurance laws that prohibit any unfair or deceptive practice in connection with the sale or solicitation of insurance. While these laws have typically been applied to non-electronic forms of advertising, insurance regulators must now re-direct their focus to e-mail and Internet solicitations.

*This Insurance Law Update was written by Michael F. Consedine of Saul Ewing LLP's Insurance and Financial Institutions Practice Group. The statements contained in this Update are intended for general information and do not constitute legal advice. Mr. Consedine serves as Partner in the Firm's Harrisburg office. He can be reached at (717) 257-7502 or at mconsedine@saul.com.*

## INSURANCE AND FINANCIAL INSTITUTIONS PRACTICE GROUP ATTORNEYS

| | | |
|---|---|---|
| Michael F. Consedine | (717) 257-7502 | mconsedine@saul.com |
| Constance B. Foster | (717) 238-7560 | cfoster@saul.com |
| Barrett W. Freedlander | (410) 332-8849 | bfreedlander@saul.com |
| Rudolph Garcia | (215) 972-1961 | rgarcia@saul.com |
| Matthew M. Haar | (717) 257-7508 | mhaar@saul.com |
| Joel C. Hopkins | (717) 257-7525 | jhopkins@saul.com |
| Paul M. Hummer | (215) 972-7788 | phummer@saul.com |
| Laura L. Katz | (410) 332-8804 | lkatz@saul.com |
| James A. Keller | (215) 972-1964 | jkeller@saul.com |
| James F. Kilcur | (215) 972-7836 | jkilcur@saul.com |
| John B. Lampi | (717) 257-7553 | jlampi@saul.com |
| Scott D. Patterson | (610) 251-5089 | spatterson@saul.com |
| Marshall B. Paul | (410) 332-8956 | mpaul@saul.com |
| Christopher J. Pippett | (610) 251-5084 | cpippett@saul.com |
| Frances R. Roggenbaum | (717) 975-7674 | froggenbaum@saul.com |
| James G. Rosenberg | (215) 972-7865 | jrosenberg@saul.com |
| Donn L. Snyder | (717) 257-7552 | dsnyder@saul.com |
| Anthony F. Walsh | (215) 972-7738 | awalsh@saul.com |
| Virginia G. White | (609) 452-3101 | vwhite@saul.com |

## SAUL EWING OFFICES

**Baltimore**
100 South Charles Street
Baltimore, MD  21201-2773
(410) 332-8600
fax: (410) 332-8862

**Chesterbrook**
1200 Liberty Ridge Drive,
Suite 200
Wayne, PA  19087-5569
(610) 251-5050
fax: (610) 651-5930

**Harrisburg**
Penn National Insurance Tower
2 North Second Street, 7th Fl.
Harrisburg, PA  17101-1604
(717) 257-7500
fax: (717) 238-4622

**Philadelphia**
Centre Square West
1500 Market Street, 38th Fl.
Philadelphia, PA  19102-2186
(215) 972-7777
fax: (215) 972-7725

**Princeton**
214 Carnegie Center,
Suite 202
Princeton, NJ  08540-6237
(609) 452-3100
fax: (609) 452-3122

**Wilmington**
222 Delaware Ave., Suite 1200
P.O. Box 1266
Wilmington, DE  19899-1266
(302) 421-6800
fax: (302) 421-6813

**Washington**
1025 Thomas Jefferson Street, N.W.
Suite 425W
Washington, D.C.  20007
(202) 342-1402
fax: (202) 342-8387